Good morning, Your Honors. Charles Nickl, appearing for the petitioner, Maria Maciel. This is a case in which the petitioner in all likelihood would have been granted cancellation of removal and permanent resident status, but for a finding that she made false statements on an asylum application. Can I stop you right there? We all know, of course, that whatever the agency does with respect to hardship determination for cancellation or removal is not reviewable by us. Yes. But you made a statement and certainly occurred, as I read through the brief, to wonder, okay, if she could have gotten past the moral character question, what would have happened? Obviously, the IJ was fairly sympathetic, and that question didn't go up because of the lie problem. Yes. What's the hardship? I understand there's hardship with respect to one of the children who was born prematurely and has asthma and breathing and immunity problems. Are there any other hardships besides that? That is the hardship, and it was an underdeveloped lung. It was beyond just asthma, but the size of the lungs were insufficient and the condition, which is... Okay, but that's it? Okay. I'm just trying to judge not what we would do because we have no jurisdiction, but what the agency might do. Okay. But the judge did indicate that he found that there were substantial equities in this case. No, the IJ made it very clear that he was sympathetic. Yes. Okay. The board, of course, issued an affirmance without an independent decision. Correct. In addition to noting that the Petitioner has substantial equities, the IJ also found that the Petitioner had been victimized by prior counsel. The judge states in his decision that in addition to the daughter having significant medical problems, that the court also agrees the Respondent was, to a substantial part, has been victimized by Mr. Gatta. This was a rather famous case here. And during the course of proceedings, Mr. Gatta was disbarred. You didn't have him on the second round, did you? On the second round? He appeared in court for her initially. On the second round? On the second. What happened was he appeared for the asylum office, and then in court, Mr. Gatta had another counsel come for him. The judge required Mr. Gatta to appear. At that time, Ms. Maciel did not even have a qualification. She told the story the second time. No. She was not he was not there. Not there. He was not there. She continued with the story. Right. How was Mr. Gatta responsible for that? Well, I mean, he she He launched her on it, and she just stuck to it. She did not. It's pretty clear. She did not understand initially that she was applying for asylum. She stated The second time she came up, after several years had gone by. Yes. What was she told? The same story. Now, how was Mr. Gatta responsible? Well, he had told her that He had told her that some time ago. Yes. She knew it was wrong. Right. She went right on with it. She went on. But the argument here is that before the asylum officer was called, she recanted. Yeah. Before the But first she told it all over again. Well, I mean, the proceedings lasted quite a while. When she really testified regarding the asylum, that was in September of 2003. And then there was a short continuance to September 30th. And at that time And she had exaggerated a claim. She said that, yes, she was beaten. Exaggerated. She lied about it. Well, yeah. I mean, she had been beaten by federal judicial police in Mexico. But she admitted that she lied about the circumstances. Yeah. She changed the context. And she said that it's not true that they came to the house and put them on a truck or beat them in the house. But she was actually beaten downtown. Meaning exaggeration is a benevolent word for that. Yeah. And she admitted that that was false. And she also, you know, she withdrew her objection to having the asylum officer's notes, made a part of the record, reviewed it, said that he would not have to testify. And she also indicated that, you know, she hadn't initially intended to apply for asylum, but had been caught in this situation in which Mr. Godhead had told her that you have to exaggerate your claim. This certainly doesn't absolve her of all guilt. You know, she's an adult. It seems to me the only chance she has of getting around what the IJ held with respect to good moral character and the lie is the recantation. And there was some delay in the recantation. That is to say she tells the story, as Judge Nunez's questions indicates, the second time around when Mr. Godhead is no longer her lawyer. And she decides to tell the truth when it's apparent that the government is going to try to produce the asylum officer. Now, what I'm trying to formulate the argument as sympathetically to her as I can, but I'm having trouble. Is there something benign about the threatened appearance of the asylum officer? Or is he really going to cook her goose when he shows up? Or is the evidence that the asylum officer has already in the record? I mean, I'm trying to figure out a way where, you know, it really doesn't make any difference whether he shows up or not. But I'm having trouble getting there. I don't think on this record it would have made much difference if the asylum officer showed up. She acknowledged that there was already conflict in her testimony regarding what happened on cross-examination. The trial attorney had indicated, well, you told us first that the police came and knocked at the door and took you all out. Or that she was beaten up in the house and that later they were taken out in a truck. And, you know, she conceded, you know, was willing to concede that that was not true. I don't think there was anything in the asylum officer's notes that are included in the record. And they're a little hard to read, but I don't think there's anything that already hadn't been brought out that would, you know. But his notes aren't going to come in unless he shows up to say, yes, those are my notes and so on. I mean, if they're challenged, they don't come in unless he shows up. Yeah. The trial attorney had, you know, referred to them and she basically conceded that those were true. So even if the asylum officer hadn't shown up, it would still, you know, she still wouldn't be absolved of having fabricated an incident on her asylum application. Now, this may be in the record, and I just don't know it yet. You can tell me. I'm not sure how much difference this might make to the ultimate disposition. Was she one of those unfortunates that was counseled by her attorney, in this case, Mr. Gada, to come forward to sort of put herself in the process and the expectation that, oh, listen, I can get you a cancellation of removal or a suspension of deportation? Yes, absolutely. That's how she comes to the attention of the authorities. She did not ever intend to apply for asylum. She, in fact, and she did not, in the beginning of the record, she didn't have a qualifying relative. And the judge asked Mr. Gada, what were you thinking when you filed this application, knowing that she doesn't meet statutory eligibility? So Gada tells her, why don't you come forward and then I can take care of you once I get you in the proceeding. Yeah. It was one of those scams. And his response was, I wanted to represent her aggressively. Yeah. So, but, you know, the main thing here is the argument. So without the intervention of Mr. Gada, she probably would be living here illegally but undetected. That is correct. Or if she were put in proceedings, she would have a very substantial likelihood of being granted permanent residence status based on a very solid cancellation application, which the judge acknowledged. So if it were not for Mr. Gada, she would have been deported quite a long time ago. Well, no, because she would never have come to the attention of the Immigration Service. I mean, he put her, intentionally put her in proceedings. He took her to the asylum office because the only way that she can apply for cancellation of removal is before an immigration judge, and you don't get there unless you're you have a charging document against you. You have to put yourself in harm's way in order to ask for relief. And it was he who put her, to use your phrase, put her in harm's way. Yes. If they discovered her, she would have been deported. No. If she had been discovered, she would have been put in removal proceedings and required to go before a judge. And if she had applied for cancellation of removal, she was no basis. She had no child. Well, but by the time she got to the individual hearing, though, she did have a child. But if it had happened at the original time when Gada took her case in hand, she would have been out of the country quite promptly. She would not have been eligible for relief at that time. But she certainly would not have put herself in and intentionally placed herself before the immigration court were it not for what the judge acknowledged was fraudulent conduct on the behalf of Mr. Gada. How did she and Gada come in contact? Well, now that, I don't know. Mr. Gada had a lot of people working for him. He did this to hundreds of people, a lot of people that he placed in proceedings. And it was a common practice of his. It was a very common scam. Yes. Why don't we hear from the government? You're out of time, but we will give you a chance to respond. Thank you. May it please the Court. Ari Nazaroff representing the Attorney General. Your Honors, I'd like to address this, what opposing counsel just mentioned, that there is no evidence that she was Ms. Masebo intentionally put into asylum proceedings by Ms. Gada. Actually, on page 176 of the record, she testified she never told her to file an application as she can see, she never told her to file an application. She never testified that she was deceived by Mr. Gada or that she didn't understand what was happening. She speaks good English. She runs three – she has three rental properties that she runs. She was lying for four years. Now, wait a minute. I'm looking at page 176. Where do you see on 176 that she denies it was Mr. Gada's idea to put her into proceedings? Mr. Gada is very well known to us. And his behavior is very well known to us. Well, it says he wasn't forcing you to file that application, was he? No. Now, where are you? I'm sorry. I'm on line 11. The question is, well, when Mr. Gada told you that you needed to lie in your application, he wasn't forcing you to file that application, was he? Force is an odd word there, right? I mean, he wasn't forcing you. Well, I read that to be that, you know, he never told her to file the application. She went ahead and she never testified that she was deceived. If you want the transcript to say told, you need a different word from force. Okay. But I think it is irrelevant to your case. So I'm not sure you need to belabor it, but. Okay. I think it's important to note with respect to the asylum officers showing up that Ms. Gada stayed with her story while testifying on September 18th before the immigration judge. And she even testified that she didn't appear for the asylum officer hearing and before the asylum officer. And so she was lying throughout. It was only when she was pushed against the wall that she conceded that she lied. As far as hardship, Your Honor, the testimony by the Dr. Sir, he testified on page 119 that the asthma is very moderate, and he also conceded to the immigration judge that he didn't know if the asthma will be short-term or long-term on page 122 of the record. So I know, Your Honor, this Court has no jurisdiction over hardship. But just that's something also to consider. The asthma is moderate. Ms. Mussel conceded that she lied under oath three times over a six-year period and two hearings. And under the statute, her petition for review should be denied. If this panel has no more questions, the government will rest.  Okay.  Thank you, Your Honor. Mr. Nichol? Yeah. I just think on that page, it was the follow-up on page 176 where she says that, you know, she understood she was applying for the 10 years, not for asylum, and that that was the, you know, what brought her to the before the Court. I think she recanted the — when she did come on September 30th, she was very straightforward and recanted and told her real situation. And I think under those circumstances, the — and also in light of the history of this case of having been subjected to fraud, that the Court might find that she recanted and that she — the case should be remanded for her to proceed with her — not for the asylum, but with the application for cancellation of removal. For the hardship? Yes. Okay. Thank you very much. Thank you. Thank both sides for their argument. Mecile v. Holder is now submitted for decision.
judges: Noonan, W. Fletcher, Duffy